NO. 4-01-0328

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE CITY OF QUINCY, ILLINOIS, an ) Appeal from

Illinois Municipal Corporation, ) Circuit Court of

Plaintiff-Appellee,      ) Adams County

v. ) No. 00ED1

DIAMOND CONSTRUCTION COMPANY, an ) 

Illinois Corporation,              ) Honorable

Defendant-Appellant. ) Mark A. Schuering,

) Judge Presiding.

_______________________________________________________________

JUSTICE KNECHT delivered the opinion of the court:

The plaintiff, City of Quincy (City), initiated an eminent domain action to acquire a portion of defendant, Diamond Construction Company's (Diamond), property to complete a street- extension project.  The City, during a five-month period, procured two strikingly different appraisals of Diamond's property.  The first appraisal was obtained before Diamond, in reliance on the City's definite plan to acquire its property, began to relocate its asphalt plant to ensure it would be operational for the next year's construction season.  The City's second appraisal was obtained on the date the condemnation complaint was filed and after Diamond had traded in and moved certain components of its plant.  The first appraisal listed the property's highest best use as an asphalt plant and the second appraisal listed it as vacant industrial.  Prior to the jury trial to determine just compensation for the taking, the trial court granted Diamond's motion 
in
 
limine
 to exclude evidence of the City's second appraisal and limit the evidence of highest and best use to an asphalt plant.  The jury awarded Diamond $1,558,640 as compensation for the taking.  The City appeals, contending the trial court abused its discretion in granting Diamond's motion 
in
 
limine
.  We affirm.

I. BACKGROUND

In September 1997, Charles Scholz, Quincy's mayor, contacted Charles Miller, Diamond's president, to discuss the City's plan to extend 18th Street through Diamond's asphalt plant.  Over the next two years, Miller communicated with various City officials concerning the City's acquisition of his property and his concerns with the timing of the taking.  Miller was concerned because he would be required to move the asphalt plant during the winter months in order for Diamond to honor its contractual obligations during the regular construction season, which usually begins in early spring. 

On October 21, 1999, Miller wrote to the City's special assistant corporation counsel, Hubert Staff, with the following concerns and requests: (1) Miller had not heard from the City in several months concerning the acquisition of his property; (2) if the City planned to go forward with the taking, Diamond would be unable to continue operations at that location; (3) Diamond was financially committed to making capital improvements in its business in order for it to honor its contractual obligations for the next spring's construction season; (4) Miller requested the City's official position regarding the acquisition of his property; and (5) time was of the essence and Diamond would begin capital improvements at the existing plant if the City did not respond by November 20, 1999.

In an October 25, 1999, response, Staff told Miller the City intended to go forward with the acquisition of his property sometime prior to the 2000 construction season.  Further, Staff told Miller he expected the city council to adopt a resolution within two weeks authorizing him to enter into negotiations with Diamond for the acquisition of its property.

On November 5, 1999, Staff again wrote to Miller, advising him the City expected to adopt a resolution on Monday, November 8, 1999, authorizing him to make an offer on the Diamond property.  The city council passed the resolution and on November 9, Scholz forwarded a letter to Miller acknowledging the City planned to acquire a portion of the Diamond property through eminent domain.

On December 13, 1999, Miller received a letter from Staff offering Diamond $462,000 for fee title to 1.88 acres of the 10-acre tract, damages to the remainder of the property, and compensation for construction easements.  Miller was advised the amount was based on an appraisal prepared by Wayne Briggs on November 9, 1999.  The appraisal concluded the value of the entire tract of property before the taking was $1,300,000.  Briggs' appraisal described the property as special use improved with an asphalt plant, which was a fixture and, thus, part of the realty and could not be moved.  Briggs stated the property's current use as an asphalt operation was consistent with the highest and best use of the property.  Finally, Briggs stated due to the nature of the taking, which would divide the Diamond property into two separate parcels, the remainder of the property after the taking would be unsuitable for use as an asphalt plant.

Prior to and immediately after receiving this letter, Miller took initial steps to relocate Diamond in an effort to ensure Diamond would be able to honor its future contractual obligations.  Part of Miller's relocation plans included trading in and selling some of the components from the old asphalt plant for a new asphalt plant to be constructed at a new location.  Miller talked to asphalt plant manufacturers and learned it would take approximately one year for the delivery and set up of a new plant.  Accordingly, Miller began the process of ordering the component parts of a new plant in May 1999.  

After the City's December 13, 1999, offer, Miller communicated for several months with City officials concerning whether the City could reimburse Diamond for various costs, such as moving expenses, and whether the City could provide a low- interest loan to Diamond.  The City offered virtually no assistance to Diamond, other than the compensation in its original offer, so Miller officially informed the City on April 5, 2000, Diamond would not accept the offer of $462,000.

On April 6, 2000, the City filed a condemnation action to acquire 1.886 acres and a construction easement on 1.04 acres of Diamond's 10-acre tract.  On August 1, 2000, the City filed a motion for immediate vesting of title and for temporary easements.  The dispute resulting in this appeal began when the City's appraiser, Wayne Briggs, sent Diamond a second appraisal report, in which he opined the highest and best use of Diamond's property was 
not
 as an asphalt plant, as Briggs stated in his first appraisal.  Rather, Briggs' second appraisal listed the highest and best value as vacant industrial, which greatly reduced the property's value.  Briggs' estimated value of the entire tract as of April 6, 2000, the date the City filed its petition for condemnation, was $220,000, and the value of the taking was $111,000.  

The record shows as of the date of Briggs' second appraisal, the following parts of Diamond's asphalt plant remained on the property: oil tanks, large scales, buildings, heating systems, a bag house, shuttle buggy, concrete footings for the plant, specialized electric and gas utility services, a masonry building, a crushed stone base, laboratory trailers, concrete ramps, loading docks, and various stockpiles of aggregate and stone used in the production of asphalt.  Briggs admitted for the second appraisal he merely drove by the property and did not physically inspect the premises.  He further stated he did not talk to Miller to ascertain whether Diamond was using the plant for any aspects of its asphalt production.  Finally, Briggs admitted he was not an expert on asphalt plants, he had never appraised an asphalt plant before his November 9, 1999, appraisal of the Diamond plant, and he did not consult with any leaders in the industry to aid in his appraisal and determination that an asphalt plant no longer existed on the property.

After Diamond received Briggs' second appraisal, it filed a traverse and motion to dismiss, citing the strikingly different appraisal values and alleging, in pertinent part, the City was prohibited from acquiring the property by eminent domain as it had acted in bad faith.  The trial court stopped short of finding the City acted in bad faith, but it did state its disapproval of the City's use of the second appraisal in the condemnation proceedings.  The trial court did not make a final ruling on the issue at that time, but it stated fundamental fairness dictated the highest and best use of Diamond's property would likely be limited to that of an asphalt plant as in the City's first appraisal and before Diamond began its relocation process.

On November 9, 2000, prior to the jury trial to determine just compensation for the taking, Diamond presented a motion 
in
 
limine
 seeking to strike Briggs' second appraisal and limit appraisal valuation testimony to the valuation of the property as an asphalt plant facility.  The trial court, stating its concerns for the preservation of fundamental fairness and due process, granted Diamond's motion and stated:

"The mere fact that there have been items removed, whether it is 15 of 20 or 5 of 20 does not eliminate it from being designated as an asphalt plant.  That definition in and of itself, if you remove tires from a car or an engine from a car doesn't make it, fail to make it a car any longer.

***

***  [T]his [c]ourt stands by its previous opinion that to permit Mr. Briggs to go out there on April the 6th and indicate before a jury, who is to determine not only the highest and best use, but first and foremost an eminent domain action what is just compensation, and to permit that in this [c]ourt's mind would not go with what I would deem to be fundamental fairness and due process.

***

I do not find that the City lured the [d]efendant, but I also don't think that they can benefit in terms of having this property defined as something other than an asphalt plant ***."

On November 13, 2000, the case proceeded to trial. In addition to the valuation evidence of the City's second appraisal, Diamond's appraiser, Dale Kleszynski, testified the value of the entire tract of property before the taking was $1,985,000.  He stated as of April 6, 2000, the highest and best use of the property was as an asphalt plant, and the damages to the property after the taking would be $1,847,200.  Kleszynski valued the temporary construction easement at $7,800 and arrived at a total compensation for the taking of $1,892,800.  The jury rendered a verdict in favor of Diamond, in the amount of $1,558,640.  

The City filed a posttrial motion, alleging the trial court improperly granted Diamond's 
motion 
in
 
limine
.  The trial court denied the City's posttrial motion on March 19, 2001, and the City appeals, contending the trial court abused its discretion in granting Diamond's motion 
in
 
limine
 precluding the admission of Briggs' second appraisal report.  

II. ANALYSIS

The City contends the trial court abused its discretion in granting Diamond's motion 
in
 
limine
 for four reasons: (1) the value of the land taken and damages to the remainder must be determined as of the date the condemnation complaint is filed; (2) highest and best use of the property is a question of fact to be determined by the jury; (3) fundamental fairness cannot change highest and best use from a matter of fact to a matter of law; and (4) even if fundamental fairness trumps the date of valuation and highest and best use being a matter of fact, there was no lack of fundamental fairness in this case.  

A trial court has broad discretion to grant or deny a motion 
in
 
limine
 as part of its inherent power to admit or exclude evidence.  As such, we will not reverse the trial court's decision to grant or deny a motion 
in
 
limine
 absent a clear abuse of discretion.  
People v. Williams
, 188 Ill. 2d 365, 369, 721 N.E.2d 539, 542 (1999).

The United States and Illinois Constitutions provide private property shall not be taken without payment of just compensation.  U.S. Const., amend. V; Ill. Const. 1970, art. I, §15.  In eminent domain cases, the only question for the jury to decide is the just compensation owed to the owner of the property to be condemned.  
City of Chicago v. Anthony
, 136 Ill. 2d 169, 174, 554 N.E.2d 1381, 1383 (1990), citing 
Sanitary District v. Johnson
, 343 Ill. 11, 16, 174 N.E. 862, 864 (1931).  "Just compensation" is defined as the fair cash market value of property at its highest as best use on the date of filing the complaint to condemn.  735 ILCS 5/7-121 (West 2000).  The highest and best use may be the property's current use or any capacity for future use which may be anticipated with reasonable certainty.  
Anthony
, 136 Ill. 2d at 174-75, 554 N.E.2d at 1383-84.     When there is a difference of opinion as to highest and best use, the issue is generally a question of fact left to the jury.  
Forest Preserve District v. Lehmann Estate, Inc.
, 388 Ill. 416, 426-27, 58 N.E.2d 538, 543 (1944).  However, the supreme court in 
Forest Preserve
 leaves open the possibility a witness' testimony as to highest and best use 
may
 be so improbable it should be excluded from the jury.  
Forest Preserve
, 388 Ill. at 426-27, 58 N.E.2d at 543.  In 
Forest Preserve
, the parties presented conflicting evidence as to whether the property's highest and best use was residential or industrial.  The property owner argued to exclude the condemnor's valuation testimony which categorized the property's highest and best use as residential.  The court examined the qualifications of the expert witnesses and their testimony and determined there was "no merit to the contention that [the condemnor's] evidence that the highest and best use of the property was for residential purposes was so inherently improbable that it should have been excluded from the jury."  
Forest Preserve
, 388 Ill. at 426, 58 N.E.2d at 543. 

The City urges us to find Briggs' second appraisal, as of the date of the filing of the complaint on April 6, 2000, is the proper valuation of the property and, therefore, should have been presented to the jury.  Diamond does not contest the date of the filing of the condemnation complaint controls the valuation of its property.  Diamond's argument rests on the premise that Briggs' second appraisal, which categorizes the highest and best use of the property as vacant industrial on April 6, 2000, lacked a proper evidentiary foundation and, given the unique facts of this case, the trial court properly barred its introduction as evidence under principles of fundamental fairness.  We agree with Diamond.

The basis of the trial court's evidentiary ruling to exclude Brigg's testimony of the property's highest and best use as anything 
other
 than an asphalt plant on April 6, 2000, was
 concern for fundamental fairness to Diamond and the rationale of the second appraisal.  In arriving at its decision, the trial court considered the testimony of both parties' appraisers and heard evidence as to the specific components of the asphalt plant that were present on April 6 and those that were traded or sold prior to April 6 as a result of Diamond's forced relocation.  The trial judge also heard evidence Briggs was not an expert in asphalt plants and he had never appraised an asphalt plant before his November 9, 1999, appraisal of the Diamond plant.  Further, prior to his second appraisal, Briggs did not talk to Miller to determine the extent of Diamond's operations at the plant as of April 6, nor did he contact experts in the asphalt industry to determine whether the property was viable as an asphalt plant if only a few of the components were missing.  The trial court also stated Miller had detrimentally relied on the City's proposed taking of his property when he took steps to relocate his asphalt plant, and the City could not later attempt to take advantage of Miller's relocation by presenting evidence to the jury the highest and best value of the property was vacant industrial due to the removal of a few components of the plant. 

The court further noted the unique facts of the case:  the City and Miller had been discussing the condemnation for a few years and Miller was in a business position where, after the City informed him of its definite plans to acquire his property prior to the 2000 construction season, Miller was 
required
 to act within a certain time frame to move and establish a new plant to ensure his business' survival.  Based on the appraisal testimony and the unique facts of the case, the court determined the 
jury should hear only evidence of the property's highest and best use as an asphalt plant.  

On appeal, the City argues "[d]efendant has cited no case law in any of its motions, memorandums[,] or arguments to support the position that fundamental fairness requires the property be valued as an asphalt plant."  The City further argues the question of highest and best use is always a question of fact for the jury and fundamental fairness cannot change the issue to a matter of law.  We need not address the
 doctrine of fundamental fairness as applied to the specific factual scenario in this case.  
As expressed above in our discussion of the 
Forest Preserve
 case, we conclude the issue of highest and best value 
may
 be a question of law for the trial judge when the evidence is so inherently improbable it should be excluded from the jury.  

Whether the issue in this case is fundamental fairness to Diamond or the inherent improbability of the evidence of highest and best use as stated in Briggs' second appraisal, the trial judge correctly ruled to exclude the evidence of Briggs' second appraisal.  We note each eminent domain case is unique and there is no "blanket rule" of eminent domain law to apply in every situation.  
Anthony
, 136 Ill. 2d at 187, 554 N.E.2d at 1389.  Further, in each case, the "'limits of the evidence necessarily rest largely in the discretion of the trial judge.'"   
Anthony
, 136 Ill. 2d at 187, 554 N.E.2d at 1389 quoting 
Chicago & Western Indiana R.R. Co. v. Heidenreich
, 254 Ill. 231, 238, 98 N.E. 567, 570 (1912).  

Given the unique facts of this case, we find the trial judge's concerns were well-founded and he acted well within his discretion to exclude evidence of the City's second appraisal.  Further, we find his decision did not contradict the well-settled rules of eminent domain law, 
i.e.
, (1) the date of valuation is to be determined on the date the condemnation complaint is filed (
Department of Transportation v. Chicago Title & Trust Co.
, 303 Ill. App. 3d 484, 496, 707 N.E.2d 637, 645-46 (1999)) and (2) differences in opinion as to highest and best use are generally questions of fact
 for the jury (see 
Central Illinois Public Service Co. v. Westervelt
, 67 Ill. 2d 207, 212, 367 N.E.2d 661, 663 (1977)).  Under the facts of this case, we conclude on April 6, 2000, there was no 
legitimate
 question whether the highest and best use of Diamond's property was anything other than an asphalt plant.  Therefore, using the parties' varying opinions as to property's highest and best value as an asphalt plant on April 6, 2000, just compensation was properly determined as of the date the complaint was filed and there was no question of fact on that issue to present to the jury.

III. CONCLUSION

We affirm the trial court's granting of Diamond's motion 
in
 
limine
 precluding the admission of Briggs' second appraisal report.  

Affirmed.

McCULLOUGH, P.J., and STEIGMANN, J., concur.